**In re TRINA ASSOCIATES, Debtor.**

**In re 317 W. 87 ASSOCIATES, Debtor.**

**In re JILLANDREA REALTY ASSOCIATES, Debtor.**

**Bankruptcy Nos. 191–12755–260 to 191–12757–260.**

United States Bankruptcy Court, E.D. New York.

June 25, 1991.

Jules A. Epstein, Mineola, N.Y., for Mitchell Pross.

Paul Weiss, Rifkin, Wharton & Carrison, New York City (Stephen J. Shimshak, of counsel), for Adam Katz on behalf of the debtors.

Salomon, Green & Ostrow, P.C. by Chester B. Salomon, New York City, for mortgagees.

## DECISION ON MOTION TO DISMISS PURSUANT TO §§ 305(a) AND 1112(b) OF THE BANKRUPTCY CODE

CONRAD B. DUBERSTEIN, Chief Judge.

Before the Court are motions to dismiss the above-captioned cases pursuant to sections 305(a) and 1112(b) of the Bankruptcy Code.

On May 1, 1991 involuntary petitions for relief under Chapter 11 pursuant to § 303 of the Bankruptcy Code were filed against each of the above debtor partnerships (collectively referred to as the "Debtors") by Mitchell Pross, a general partner ("Petitioner"). The Debtors are limited partnerships formed in 1981 to manage residential rental properties and to undertake cooperative or condominium conversions of their properties. In lieu of answers, each Debtor countered by moving for the dismissal of each case under §§ 305 and 1112(b). The motions were joined in by the secured creditors of each Debtor. Orders granting the Chapter 11 relief have been held in abeyance pending the determination of the motions.

In light of the facts and circumstances hereinafter discussed, particularly involving a certain settlement agreement in a foreclosure action in the Supreme Court of the State of New York, County of New York, the need to proceed with dispatch to determine the issues involved did not allow time for this Court to conduct full evidentiary hearings in support of or in opposition to the relief requested by the parties. Instead and with the consent of all parties, it held two days of hearings during which it carefully considered counsels' arguments in support of their respective motions and reserved decision pending the submission of findings of fact and memoranda of law by each. In addition, this Court has examined a wealth of exhibits, affidavits and

memoranda in support of and in opposition to the motions, as well as the findings of fact submitted. It has adopted some and rejected others in making the following findings of fact and conclusions of law. For reasons hereinafter set forth, the motions to dismiss under § 305 are granted and the motions for relief under Chapter 11 are denied.

These cases are no different from the many Chapter 11 cases which are filed almost every day throughout the country. Whether it is a debtor which voluntarily seeks the benefits offered by Chapter 11 in its efforts to overcome financial difficulties, or creditors which look to Chapter 11 by filing an involuntary petition for such relief in order to rehabilitate a debtor believed to be worthy of such an effort, the bankruptcy court has become more like the religious edifice of yore to which those seeking protection would come for sanctuary, or the embassy of some foreign country whose nationals look to it for protection from their enemies. The bankruptcy court will do what it legally and equitably can as prescribed by the Bankruptcy Code, the Bankruptcy Rules and the weight of authority. The debtor will either eventually emerge reorganized, rehabilitated or rejected. Oft times its sheltered existence arising from the automatic stay provided for by § 362 will come to a grinding halt and its case will be dismissed or converted to one under Chapter 7. Here a general partner seeks to place his partnerships into the Chapter 11 arena. This Court finds that although the debtors might qualify as Chapter 11 candidates, the facts and circumstances relating to the many faceted transactions among the partners involving their interests in the properties, the history of their litigious relationship, and the existence of a pending settlement in an action in the Supreme Court of the State of New York do not justify the use of the bankruptcy tribunal to solve their woes. In plain Brooklyn English, these cases don't belong here and the parties should go back to the state court of the State of New York, County of New York, where they belong.

The following findings of fact reflect the many factors to which the Court has looked in arriving at its conclusion.

### FINDINGS OF FACT

*The Debtors*

1. Trina Associates ("Trina") owns an apartment building located at 245 West 74th Street and a number of unsold condominium apartments located at 29 West 65th Street, New York, New York.

2. 317 West 87 Associates ("317") owns an apartment building located at 317 West 87th Street.

3. Jillandrea Realty Associates ("Jillandrea") owns an apartment building located at 310 West 85th Street and a number of unsold condominium apartments at 420 Central Park West.

4. Plans to convert 245 West 74th Street, 310 West 85th Street and 317 West 87th Street, New York, New York to cooperative ownership have been accepted for filing by the New York Attorney General. However, the plans have not as yet been declared effective.

5. The Petitioner claims that the gross offering prices for the plans are as follows: 245 West 74th Street—$11,903,000 (insider price) or $14,755,000.00 (outside purchaser); 310 West 85th Street—$7,151,000.00 or $8,049,000.00; and, 317 West 87th Street—$6,062,000.00 or 8,055,000.00. The Court makes no finding as to the prospects of the Debtors' ability to obtain those prices for properties offered, nor does it make any finding as to the fair market value of the properties.

6. To comply with applicable law, two of the plans must be declared effective by January 11, 1992 and the third by January 17, 1992 or the plans for conversion will be deemed abandoned.

7. The Petitioner admits the Partnerships are insolvent. No party has claimed that there is presently any equity in the Debtors' properties.

*Ownership and Control of the Debtors*

8. Mitchell Pross was designated general partner of each Debtor in the certificates

of limited partnership filed in the Suffolk County Clerks office.

9. Pursuant to a preliminary injunction, dated July 9, 1985 by Justice Richard Wallach, in an action entitled *Katz v. Pross,* in the Supreme Court State of New York, County of New York, Adam Katz was given sole authority to act for the Debtors in connection with the closing of the conversion plans or the sale of apartments owned by the Debtors.

10. Adam Katz has been functioning in the role of acting general partner for the Debtors at least as of the time of the entry of the above-mentioned order of Justice Wallach.

11. Ownership of the Debtors' limited partnership interests is contested.

12. It is not disputed that Mitchell Pross controls a five percent interest in each of the Debtors.

13. Justice Wallach's order includes a preliminary finding that Arnold Pross, father of Mitchell Pross owns a five (5) percent interest in Jillandrea and an eight (8) percent interest in 317.

14. Adam Katz contends that he is the principal limited partner of each Debtor holding an ownership interest of 95 percent in Trina, 90 percent in Jillandrea and 87 percent in 317.

15. Adam Katz's claim that he is the principal limited partner stems from the assignment of Arnold Pross's interests in the Debtors to one Edwin Merrin who in turn assigned those interests to Adam Katz. Although Arnold Pross admits his signature appears on the assignment to Edwin Merrin, he maintains that he did not intend to assign his interest to Merrin and that it has not been established what consideration passed from Merrin to Arnold Pross.

16. For the sole purpose of determining whether to issue a preliminary injunction enjoining Arnold and Mitchell Pross from acting on behalf of the Debtors, Justice Wallach made a preliminary finding that Adam Katz was the principal limited partner of the Debtors.

*The Creditor Partnerships*

17. All properties were conveyed to the Debtors by certain limited partnerships, specifically, Vivian Realty Co. ("Vivian"), Oliver Realty Co. ("Oliver"), Zadik Realty Co. ("Zadik") and Columbian Realty Co. ("Columbian") (collectively known as the "Creditor Partnerships").

18. Curtis Katz serves as the general partner of Oliver, Zadik and Columbian, is authorized to act on behalf of Vivian and therefore controls the Creditor Partnerships.

19. The Petitioner claims that the ownership and control of Vivian is in dispute. He alleges that 317 is the beneficial owner of 317 West 87th Street, but that title is in the name of Vivian; that on June 25, 1981 all ownership interests in Vivian were assigned to 317 by Vivian's former owners including Curtis Katz, the father of Adam Katz; that by virtue of its ownership of Vivian, 317 beneficially owns a mortgage wherein Vivian is the mortgagee encumbering 310 West 85th Street which is owned by Jillandrea.

20. The conveyances of the properties by the Creditor Partnerships to the Debtors occurred on June 25, 1981. Vivian conveyed 310 West 85th Street to Jillandrea, and 317 West 87th Street to 317. Zadik conveyed 245 West 74th Street to Trina. Oliver conveyed 29 West 65th Street to Trina. Columbian conveyed 420 Central Park West to Jillandrea.

21. The properties were conveyed to each Debtor by the Creditor Partnerships in exchange for a small amount of cash, the assumption of existing debt on the properties, and purchase money mortgages each in the amount of either $2 million or $2.25 million.

22. Mitchell Pross signed each of the promissory notes and mortgages as general partner of record of each Debtor.

23. Under the terms of the mortgages and notes, the debt was to be paid in semi-annual installments of interest at the rate of five (5) percent per annum for a period of five years, at which time the unpaid balance of principal plus accrued interest,

if any, would be due and payable, the Default rate of interest being fixed at two (2) percent per month.

24. All three Debtors defaulted on their mortgages on all five pieces of property. Mortgage debts in the aggregate exceed $20 million in principal and accrued interest.

*State Court Litigation*

25. In 1984, Adam Katz commenced the aforementioned action in the Supreme Court of the State of New York, County of New York, captioned *Katz v. Pross*, in which he was granted the said preliminary injunction removing Arnold and Mitchell Pross from management of the Debtors and authorizing Adam Katz to act for the partnerships instead. He also sued for damages based on breach of fiduciary duty, negligent mismanagement and conversion.

26. In that action Mitchell Pross counterclaimed with a demand for a receiver, an accounting and dissolution of the Debtors.

27. Adam Katz's motion for a preliminary injunction was granted to the extent that (a) he was given sole authority to act for Trina in connection with the closing of the conversion plan for 29 West 65th Street; (b) he was given sole authority to act for Jillandrea in negotiating and completing apartment sales to tenants in 420 Central Park West; (c) he was given sole authority to act on behalf of the Debtors before the Attorney General in filing any amendments or in curing any deficiencies with respect to any partnership conversion plan; (d) Arnold Pross and Mitchell Pross were enjoined from taking any action with reference to items (a) through (c) or from holding themselves out to anyone as authorized to so act.

28. In April 1989 Mitchell Pross commenced an action in the Supreme Court of the State of New York, County of New York against several defendants including Adam Katz. The action alleged that the defendants lacked authority to proceed with the cooperative conversions of the Debtors properties and sought to enjoin the conversions.

29. In a decision in said action dated December 18, 1989, Hon. Diane A. Lebedeff granted Adam Katzs' motion to dismiss that action on the grounds there was another pending action between the same parties regarding the same subject matter, and on the grounds that the purpose of the action was merely to circumvent the effect of the preliminary injunction issued by Justice Wallach. In that decision Justice Lebedeff also sanctioned Mitchell Pross for the knowing violation of Justice Wallach's preliminary injunction.

30. There is also litigation pending in the Supreme Court State of New York, New York County commenced by the Creditor Partnerships in January 1987, to foreclose the mortgages on all of the five properties owned by the Debtors.

31. As Curtis Katz is either the general partner or authorized to act on behalf of all four Creditor Partnerships, and Adam Katz was acting as general partner of the Debtors pursuant to the preliminary injunction issued by Justice Wallach, Arnold Pross claimed that Adam Katz had a conflict of interest and should not be the party responsible for defending the foreclosure actions. As a result, Adam Katz stipulated in that state court action that Arnold Pross be allowed to defend those actions. Arnold Pross has been the party responsible for defending the Debtors in those actions.

32. In July 1989, the Creditor Partnerships moved for summary judgment in the foreclosure action.

33. In opposition to the motion for summary judgment Arnold Pross asserted several defenses including: (a) Adam Katz was responsible for the defaults in the mortgages by failing to apply available proceeds for mortgage payments and failing to assist or participate in timely conversions of several properties; (b) the Katzes have failed to account for $5,000,000.00 of condominium sale proceeds; (c) the ownership of Vivian Realty Co. was in dispute.

34. On January 4, 1990, Justice Lebedeff denied Creditor Partnerships' motion for summary judgment. In her decision she dismissed many of the defenses asserted by Pross. However, she held that there

still existed an issue of fact as to whether conversion proceeds were sufficient and should have been used to satisfy the mortgages on the Debtors properties. That decision states:

[I]t is also claimed that during the operation of the partnerships, Adam Katz or those in privity with him failed to apply more than $4 million in cooperative sales proceeds to payment of the outstanding mortgages. There are disputes of fact and the Katzes have not yet fully explained the disposition of the proceeds obtained thus far from cooperative conversions. The transaction should be looked at particularly closely in light of the potential "less than arms' length" relationship between Adam Katz and members of the Katz family who control the mortgagees. This court is aware of the prior order of Justice Wallach relating to mismanagement of the cooperative corporations [by the Prosses] and the contempt order of Justice Saxe relating to false or back dated documents [proffered by the Prosses]. However, even though the conduct of Mitchell and Arnold Pross may have been reprehensible, they should be given a fair opportunity through discovery to prove that Adam Katz and Curtis Katz sought to *procure* defaults on the mortgages by failing to apply sales proceeds to payments on the mortgages. (Emphasis in original).

35. Subsequently, Justice Lebedeff entered an order modifying her decision of January 4, 1990. In her order of March 11, 1991, Justice Lebedeff noted that only two properties had been converted to condominiums and hence the defense of failure to apply sales proceeds to the mortgages should only apply to those two properties and not to those properties that had not as yet been converted.

36. As a result of the order of March 11, 1991 summary judgment was granted in favor of the Creditor Partnerships against the Debtors and Mitchell and Arnold Pross for the properties at 310 West 85th Street, 317 West 87th Street, and 245 West 74th Street.

37. Partial summary judgment was granted in favor of the Creditor Partnerships with respect to the two remaining properties, namely 29 West 65th Street and 420 Central Park West. Summary judgment was granted to the extent that $2.5 million was awarded to the plaintiffs by reason of the Debtor's default under the mortgages, but was denied to the extent that the court refused to strike the defense that certain conversion proceeds should have been applied to the payment of the mortgages and that Adam Katz failed to do so.

*The Out–of–Court–Settlement Agreement*

38. Following the entry of the state court's order of summary judgment and partial summary judgment, the Creditor Partnerships entered into a settlement agreement (the "Settlement Agreement") with the Debtors.

39. Adam Katz, acting on behalf of the Debtors, and Curtis Katz, acting on behalf of the Creditor Partnerships, signed the Settlement Agreement.

40. The Settlement Agreement was presented to Supreme Court Justice Diane A. Lebedeff for her review and approval.

41. Adam Katz entered into the Settlement Agreement on behalf of the Debtors pursuant to the order of Justice Wallach which had authorized him to act on behalf of the Debtors in connection with the closing of the conversion plans or the sale of apartments. This court makes no finding of fact as to the authority of Adam Katz to enter into such an agreement on behalf of the Debtors.

42. Neither Mitchell nor Arnold Pross participated in the negotiations resulting in the Settlement Agreement. This Court makes no finding as to whether the Prosses declined to participate in or were excluded from such negotiations.

43. The Settlement agreement is contingent on the approval by Justice Lebedeff and upon the declaration of the plans for conversion as effective on or before December 31, 1991.

44. The Settlement Agreement is premised on the assumption that the liability

under the notes and mortgages as of April 1, 1991, including in each case principal and accrued post-default interest at the rate of two (2) percent per month as provided in such notes and mortgages (before calculating costs or expenses or any other amounts that may be due) is not less than:

(a) $4,040,000.00 under the 310 West 85th Mortgage and Note;

(b) $4,040,000.00 under the 317 West 87th Mortgage and Note;

(c) $4,040,000.00 under the 245 West 74th Mortgage and Note;

(d) $4,040 under the 29 West 65th Mortgage and Note; and,

(e) $4,545,000 under the 420 Central Park West Mortgage and Note.

45. The Settlement Agreement is also premised on the assumption that immediate foreclosure of the Debtors' properties will result in a deficiency for which the Debtors and certain partners will be liable, whereas, if the Debtors are allowed to proceed with the plans to convert the properties, the total value realized will be greater and there will be a commensurate decrease in any deficiency exposure.

46. Under the Settlement Agreement, the Creditor Partnerships will forbear from foreclosing on the Debtors' properties to allow the Debtors to convert their rental properties to cooperative ownership.

47. The Settlement Agreement provides a resolution of the foreclosure actions for the three properties that have not as yet been converted to cooperative ownership, namely 310 West 85th, 317 West 87th and 245 West 74th, and a second plan for the two properties that have already been converted.

48. For the three properties that have not been converted, the Settlement Agreement provides for a modification and extension of the existing mortgage indebtedness when the conversions are consummated as follows: (a) the indebtedness is reduced to $950,000 for 310 W. 85th and 317 West 87th; and, (b) the indebtedness is reduced to $1,750,000 for 245 West 74th. Interest on the modified mortgages will be payable monthly for a period of ten years at a rate of (i) 9¾ percent per annum for the first 60

monthly interest payments and (ii) thereafter at a rate adjusted monthly equal to the higher of 10¾ percent per annum or 1¾ percent per annum above the "base rate" charged by Citibank N.A. According to the terms of the Settlement Agreement, after the consummation of the conversion, the Debtors will convey the properties to new corporate entities in consideration of a wraparound mortgage in favor of each Debtor for $50,000 more than the above-stated amount of indebtedness, thus allowing the Debtors to retain $50,000 in equity in the properties. The Debtors will be obligated to pay the conversion proceeds to the Creditor Partnerships and will refinance the remainder of the pre-conversion debt with a new note to the Creditor Partnerships for the following amount: the original principal amount of the mortgage, plus 20 percent annually from the date the Debtor defaulted on the original mortgage principal, less the amount still secured by the mortgage, and less the amount of proceeds from the conversion paid over to the Creditor Partnerships. The new note will be secured by the Debtors' unsold shares and proprietary leases in the new cooperative property.

49. The result of the Settlement agreement is the agreement of the Creditor Partnerships to a reduction of the amount of principal as well as a reduction in the amount of interest from the present rate of 24 percent to 20 percent in the case of the three properties to be converted.

50. As for the two properties that have already been converted to condominium ownership, the Settlement Agreement provides for a reduction in the amount of the existing debt to an amount equal to the original principal amount of the mortgage plus interest at a rate of 12 percent annually from the date of the Debtor's default, as opposed to the current rate of 24 percent. The reduced amount will be payable three years after the Settlement Agreement, with interest payable monthly at 10¾ percent per annum. In addition, upon consummation of the settlement, the Debtors will pay the Creditor Partnerships the amount of cash on hand at that time, approximately

$1.5 million in each case, in further reduction of the mortgage debt.

*Procedural History*

51. The involuntary petitions in bankruptcy filed in each of these three cases allege, *inter alia:*

6. The Debtor[s are] not generally paying [their] debts which are not subject to bona fide dispute (except to the extent that Adam Katz has colluded with alleged secured creditors not to pay debts) as they become due as indicated by the commencement of foreclosure actions by alleged mortgagees holding mortgages against the above-described properties and of an order in the Supreme Court of the State of New York, County of New York, directing judgment of foreclosure against the Debtor's assets. In addition, Adam Katz has stated under oath that the Debtor is insolvent and not paying its alleged debts as they become due.

7. Transactions between Adam Katz and the alleged secured creditors are not arms length. Adam Katz, through his attorney has threatened that Petitioner may be held personally liable for deficiency judgments.

52. This Court has not been presented with evidence indicating the existence of any unsecured creditors.

53. The secured creditors, namely the Creditor Partnerships oppose the entry of any orders for relief.

54. This Court has stayed the entry of orders for relief in each of these three cases.

55. These cases have not been consolidated for administrative purposes, nonetheless, all parties and their counsel have proceeded as if the cases have been administratively consolidated.

56. Motions to dismiss these cases were made by Adam Katz on behalf of the Debtors by order to show cause signed May 23, 1991. The Creditor Partnerships subsequently appeared and joined in support of the motions to dismiss.

57. Hearings on the motions were held on May 30, 1991 and June 10, 1991 before this Court.

58. The Petitioner has proffered the skeleton of a plan of reorganization in the event Chapter 11 relief is granted in these cases which include the following elements:

a. The appointment of a trustee pursuant to § 1104 of the Code to operate the Debtors;

b. The trustee's pursuit of claims against Adam Katz to account for the proceeds of all apartment sales at 420 Central Park West and 29 West 65th Street. The Petitioner estimates that those proceeds total at least $6,000,-000.00 and claims they are available to pay mortgage debt;

c. The trustee's pursuit of claims against Adam Katz for malfeasance and failing to earlier convert the three rental properties or refinance the properties;

d. The trustee's pursuit of claims against Adam Katz to hold him liable for extraordinary interest charges accumulated against Debtors, or attempt to disallow the secured creditors interest claims under § 502(b)(1) of the Code;

e. The petition filings halting further interest accrual to Debtors' benefit;

f. The trustee finalizing conversion of the three rental properties;

g. The trustee gaining control of the Vivian Realty Co. mortgage of which 317 West 87 Associates is the beneficial owner.

59. The Court makes no finding of fact as to the merit or likelihood of success of the cause of action set forth in Petitioner's proposed plan of reorganization as outlined above.

60. To the extent that any conclusion of law is deemed to be a finding of fact, it shall be considered a finding of fact as if it were set forth above.

## DISCUSSION

### I. DISMISSAL OF THESE CASES PURSUANT TO SECTION 305

The Movants contend that these cases should be dismissed pursuant to section 305

of the Bankruptcy Code. This section states:

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension;

Looking to the legislative history, a case may be dismissed pursuant to this section: if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case. H.R. 95–595, 95th Cong. 1st Sess. 325 (1977). S.R. No. 95–989, 95th Cong. 2d Sess. 36 (1978), U.S. Code Cong. & Admin. News pp. 5787, 6281, 5822 (1978).

See In re Pine Lake Village Apartment Co., 16 B.R. 750, 753 (Bankr.S.D.N.Y.1982); In re Artists' Outlet, Inc., 25 B.R. 231, 232 (Bankr.D.Mass.1982).

Some courts rely on a three part test to decide whether or not to abstain pursuant to § 305. The prongs of that test are: (1) the petition was filed by a few recalcitrant creditors and that most creditors oppose the bankruptcy; (2) there is a state insolvency proceeding or an out-of-court arrangement pending; and (3) that dismissal is in the best interest of the debtor and all creditors. See In re Sherwood Enterprises, Inc., 112 B.R. 165 (Bankr.S.D.Tex.1989); In re Rai Marketing Services, Inc., 20 B.R. 943 (Bankr.D.Kan.1982); In re Luftek, 6 B.R. 539 (Bankr.E.D.N.Y.1980).

■ Although the tests are useful, in determining whether dismissal under § 305(a) is appropriate, courts must look to the facts of the individual cases. In re Fitzgerald Group, 38 B.R. 16, 17 (Bankr. S.D.N.Y.1983); In re Artists' Outlet, Inc., 25 B.R. 231 (Bankr.D.Mass.1982). In examining the facts of each case, court have considered a number of different criteria to determine whether a case should be dismissed under this section including:

(1) economy and efficiency of administration; (2) whether another forum is available to protect the interest of both parties or there is already a pending proceeding in a state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving the equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interest in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which jurisdiction has been sought. In re Fax Station, Inc. 118 B.R. 176, 177 (Bankr.D.R.I.1990).

As will become evident from the following discussion and application of the three part test described above, many of the different criteria mentioned in In re Fax Station, Inc., supra, are present in this case.

■ Applying the three part test to these cases, the question first addressed is whether the petition was filed by a few recalcitrant creditors and whether creditors oppose the bankruptcy.

The Petitioner is technically correct when he argues that these are not cases commenced by a "few recalcitrant creditors." It is clear that the petitions were not filed by a "few recalcitrant creditors" but by one general partner of the Debtors. The Petitioner contends there is a difference between recalcitrant creditors filing an involuntary Chapter 11 in order to extract a better settlement from a debtor and the Petitioner in this case who faces potential multi-million dollar deficiency judgments.

■ Although it may be true that the Petitioner is confronted with substantial liability exposure for partnership debt, a creditor may be faced with the equally daunting prospect of non-payment of a large outstanding debt. This Court is of

the opinion that there is no meaningful difference between creditors looking to extract a better settlement of a debt owed to them and a general partner maneuvering to minimize his personal liability for partnership debt. Both are looking to avoid monetary loss at the expense of the debtor and other creditors.

"Petitioning creditors are generally disgruntled but when they are motivated by reasons other than the debtor's insolvency, the court should take a second look at the situation to see if in fact bankruptcy is the best route for all concerned." *In re Rai Marketing Services, Inc.*, 20 B.R. 943, 946 (Bankr.D.Kansas 1982). Hence, in order in determine whether these involuntary cases were filed by one who fits within the category "recalcitrant creditor," the purposes for which jurisdiction is sought requires examination.

The Petitioner claims that the instant case is necessary to limit his liability exposure. Moreover, he contends that it is appropriate for a general partner to file an involuntary petition against the partnership if the other general partners are engaging in acts detrimental to the partnership which may result in personal liability to the petitioning partner.

The petitioner alleges that the detrimental acts committed by the Katzes include: (i) failure to account for millions of dollars of proceeds of condominium apartment sales; (ii) failure to promptly convert three rental properties to cooperative ownership; (iii) failure to refinance secured debt on partnership property at market interest rates, while interest accrued at 24 percent per annum under the existing mortgages; and (iv) formulation of a plan to bankrupt the partnerships by allowing extraordinary interest to accumulate in favor of insider-secured creditors in order to freeze out petitioner and other alleged minority partnership interests.

■ To support his proposition, the Petitioner quotes from the case of *Roxy Roller Rink* 67 B.R. 474, 475 (Bankr. S.D.N.Y.1985), *aff'd*, 67 B.R. 479 (S.D.N.Y.1986) (quoting 2 Collier on Bankruptcy 303.09 (15th Ed.)):

A general partner may want to file a petition on behalf of the partnership when he believes the other general partners committed acts detrimental to the partnership and its creditors which may result in personal liability on the part of the filing general partner.

That language is misleading when taken out of context. It is necessary to read further to completely understand the point the author is making. The next paragraph in Collier states:

The partner would have to allege that the partnership is not paying its debts as they become due. If such detrimental acts by the other general partners *could lead to objections to discharge being filed or commencement of nondischargeability litigation in a possible personal bankruptcy by the filing general partner*, then an orderly liquidation and administration of the partnership by a trustee may enlarge the distributable estate of the partnership through recovery of voidable transfers and the invalidation of liens. This result may limit the personal nondischargeability exposure of the filing general partner or may totally avoid the need for him to file a personal bankruptcy case. 2 Collier on Bankruptcy 303.09 (15th Ed.1991) (emphasis added).

■ From the above-quoted language it is evident that the bankruptcy court is not to be used to protect a partner when its peer is committing acts which may result in an increase in the overall partnership debt. If that were the case, a bankruptcy petition would be filed every time one partner disagreed with a business decision made by another partner. Contrary to the Petitioner's contentions, the Bankruptcy Court is not the appropriate forum to resolve claims regarding the nonfeasance or malfeasance of a partner's duties. *See In re Beacon Reef Limited Partnership*, 43 B.R. 644 (Bankr.S.D.Fla.1984).

■ An involuntary petition in bankruptcy is envisioned when the detrimental acts committed by one general partner may prevent another general partner from ob-

taining a discharge in his personal bankruptcy case. Assuming *arguendo* that the Petitioner's allegations are true, there may be several causes of action against the Katzes under New York State law including breach of a fiduciary duty owed to the Debtors. However, this Court does not see how a creditor, trustee or other party in interest could use the above stated allegations to object to the Petitioner's discharge or the dischargeability of a particular debt if the Petitioner himself filed for bankruptcy.

■ The petitioner has not convinced this court that the above stated allegations form a proper basis for subjecting the Debtors to a Chapter 11 bankruptcy. Moreover, it is clear that at least some of the Petitioner's allegations have been made in connection with certain unsuccessful state court actions. The Bankruptcy court should not be used as an alternative approach to state court procedures to resolve intra-company management disputes. *In re Fax Station, Inc.*, 118 B.R. 176, 178 (Bankr.D.R.I.1990).

■ Putting aside the petitioner's motivations for the moment, the Petitioner has alleged he is a partner in a limited partnership which has not been paying undisputed debts as they become due. Hence, according to the plain language of § 303, he may commence an involuntary bankruptcy case. However, "[d]ismissal pursuant to § 305 is appropriate even where petitioning creditors have established a case for an involuntary bankruptcy." *In re Williamsburg Suites*, 117 B.R. 216, 218 (Bankr.E.D.Va.1990). In deciding whether or not to abstain the court must determine whether bankruptcy would be in the best interest of all concerned. Relative to this determination is whether there are pending arrangements that will equitably satisfy the creditors and not be unduly burdensome or prejudicial to the debtor. *In re Rai Marketing Services, Inc.*, 20 B.R. 943, 946 (Bankr.D.Kansas 1982).

Continuing with the first part of the test, it is clear that the Creditor Partnerships, the secured creditors of the Debtors, oppose the bankruptcy. No creditor has appeared to support the Petitioner.

As for the second part of the test, there is an out-of-court arrangement pending. A Settlement Agreement has been drafted settling the foreclosure action commenced by the Creditor Partnerships. By the terms of that Agreement, the Creditor Partnerships will forebear foreclosing on the Debtor's property for a time to allow the Debtors to complete the conversion of the three properties. Both the Petitioner and the Movants agree that conversion of the properties will maximize the value of the properties and is in the Debtors' best interest. The Creditor Partnerships have also agreed to forgive a portion of the interest and principal.

The Settlement Agreement was signed by Adam Katz on behalf of the Debtors. The Petitioner asserts that there is no true out-of-court arrangement since Adam Katz does not have the authority to enter into such an agreement on behalf of the Debtor. He contends that Adam Katz is merely a limited partner and the only authority he has to conduct the affairs of the Debtor is by virtue of the preliminary injunction issued by Justice Wallach.

Nonetheless the Petitioner has conceded that Adam Katz has had full control of the Debtors, and has operated and managed the Debtors for the last five or six years. Moreover, the preliminary injunction does authorize Adam Katz to act on behalf of the Debtors in connection with the plans for conversion. It is also apparent that Mitchell Pross has been enjoined from interfering in the conversion of the Debtors' properties to cooperative ownership. The commencement of the involuntary bankruptcy has forestalled the consummation of the Settlement Agreement. The Settlement purports to be the only way to prevent foreclosure and allow conversion. Thus, the Petitioner's commencement of these cases may be interfering in the conversion of the Debtors and may be deemed a violation of that injunction.

■ Presently the Settlement Agreement is before Justice Lebedeff for her approval. This court recognizes that in

ordinary circumstances, there is no need for a settlement of a foreclosure action to be authorized by the court. However, as per the terms of the Settlement Agreement, it is not effective unless and until the agreement is so authorized. Considering the fact that the Petitioner contests Adam Katz's authority, seeking Justice Lebedeff's approval is prudent. If she authorizes the settlement it may put to bed the issue of Adam Katzs' authority to enter into the agreement.

■■■ This Court finds that there is indeed a pending out-of-court arrangement as evidenced by the proposed Settlement Agreement. That a question exists as to whether Adam Katz may act for the Debtors does not nullify the existence of the Agreement. However, it does raise a red flag that the problems plaguing these Debtors have less to do with their insolvency than with the interpartnership disputes.

The final test to be considered is whether the Settlement is in the best interest of creditors and the Debtors.

There is no dispute that dismissing the case is in the best interest of creditors. However "§ 305 expressly requires a determination that not only will the interests of creditors be better served by a dismissal or suspension, but also that 'the interests of the debtor be served by such dismissal'." *In re Pine Lake Village Apartment Co.,* 16 B.R. at 753. In essence, this court is being asked to decide whether it is in the best interest of the Debtors to resolve its economic problems through a Chapter 11 reorganization or by entering into a Settlement Agreement.

Adam Katz and the Creditor Partnerships contend that it is in the best interests of the Debtors to dismiss this case. The Petitioner obviously maintains that Chapter 11 is the best route for the Debtor. Complicating matters is the fact that the Petitioner is a partner of the Debtors, hence we have two parties purporting to speak for the same Debtors suggesting solutions that are diametrically opposed.

The Creditors and the Movants claim the Settlement Agreement is the only feasible route for the Debtor and if the Debtors do not enter into such an agreement, the Creditor Partnerships will foreclose their interests in the Debtors' properties, stripping the Debtors of all their assets. Additionally, the Settlement Agreement, by forgiving a portion of the principal and interest and extending the time to pay down the notes will allow the Debtors to complete the conversion of the properties and maximize the value of the properties.

The Petitioner argues that the Settlement Agreement is not in the best interests of the Debtors and is deficient in at least three aspects. First, the Agreement does not take into account millions of dollars of prior apartment sale proceeds and the plan will effectively insulate Adam Katz from accounting for those monies. Second, the Settlement Agreement leaves the Debtors responsible for the payment of interest for more than four years at the exorbitant rate of 24 percent per annum, without holding Adam Katz himself accountable for failing to convert three of the five partnership properties to cooperative ownership earlier and failing to refinance the mortgages at a lower rate of interest. Third, the Settlement Agreement provides for the Prosses to remain liable for substantial deficiency judgments, while making no similar provision for Adam Katz who alleges himself to be the dominant partner.

The Petitioner claims that a Chapter 11 reorganization is in the best interest of the Debtors because a trustee could be appointed to pursue claims on behalf of the Debtors against Adam Katz. He maintains that the successful resolution of those actions will produce a windfall for the Debtors and that the proposed cash infusion may well enable the Debtors to entirely satisfy the mortgages on the two properties that have already been converted to condominiums and may even be sufficient to pay down the mortgages on the other properties to some extent. The Petitioner also argues that the Chapter 11 trustee could also complete the conversion of the property so as to maximize the value of the properties.

The Creditor Partnerships maintain that a Chapter 11 plan is not feasible for many reasons. First of all the Debtors have no

unencumbered assets and no money to pay the expenses associated with a Chapter 11 reorganization including the payment of professional fees, administrative creditors and the United States Trustee's quarterly fees. Most importantly, there is no money to fund a plan.

This Court recognizes that there is no assurance Justice Lebedeff will approve the Settlement or that the conversions will be effective by the end of December. Additionally, the court acknowledges that Curtis Katz controls all the Creditor Partnerships and his son Adam Katz negotiated the Settlement Agreement on behalf of the Debtors, hence it is, as Justice Lebedeff put it, "less than an arms' length agreement." On top of that, it has not yet been determined whether Adam Katz is indeed authorized to enter into such Settlement Agreement on behalf of the Debtors.

However, the alternative proposed by the Prosses is even more problematic. The Prosses and the Katzes have been engaged in state court litigation for over five years. Many of the allegations raised by the Petitioner in this Chapter 11 case were raised in the context of the various state court litigations with minimal success. There is no reason to believe that a trustee will be any more successful, nor will be able to resolve the disputes any more expeditiously. It is also debatable whether the trustee will commence the litigation suggested by the Petitioners. After investigating the allegations, the trustee may determine that the claims are frivolous or that a small likelihood of success does not warrant the investment of time and resources. The Court also questions whether it is realistic to expect that a trustee will be able to meet the January deadline set for declaring the plans for conversion effective and at the same time aggressively prosecute the various causes of action against the Katzes.

Furthermore the court may order the appointment of a Chapter 11 trustee only if the protection afforded by a trustee is needed and the costs and expenses of a trustee would not be disproportionately higher than the value of the protection afforded. H.R.Rep. No. 595, 95th Cong., 1st Sess. 402–403 (1977). Considering the uncertainty of any return on the trustees investment of time and resource in bringing the causes of action, it is dubious whether the court would actually deem this an appropriate case in which to order the appointment of a trustee.

The monies generated by successfully litigating claims against the Katzes are the only funds the Petitioner looks to for the purposes of financing a plan of reorganization. For the above stated reasons, it is at best speculative that the Debtors will actually realize those monies. Hence, a successful reorganization is unlikely. It appears the Prosses work on the assumption that the Creditor Partnerships are going to sit idly by and wait for their money. The Creditor Partnerships have indicated in the course of the hearings that if this court does not abstain, it will immediately move to lift the automatic stay so that it may foreclose its mortgages. Although it is premature to predict the outcome of such a motion, the facts and circumstances augur in favor of granting the relief sought by the Creditor Partnership.[1]

Conceding that the Settlement Agreement is flawed, this Court nonetheless concludes it would be in the best interests of

---

1. Section 362(d) of the Bankruptcy Code states:
    (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—

    \*　　\*　　\*　　\*　　\*　　\*

    (2) with respect to a stay of an act against property under subsection (a) of this section, if—
    (A) the debtor does not have equity in such property; and

(B) such property is not necessary to an effective reorganization.
    It is a fact that there is no equity in the property. The second prong of that test has been interpreted to mean that the stay should be lifted if there is no reasonable likelihood of reorganization due to creditor dissent or feasibility considerations. *In re Albany Partners, Ltd.*, 749 F.2d 670, 673 (11th Cir.1984).
    This Court has already concluded that a successful reorganization is unlikely.

the Debtors to dismiss this case so that the Debtors may proceed before the State Court in an effort to consummate the Settlement Agreement.

## II. DISMISSAL OF THESE CASE PURSUANT TO SECTION 1112(b)

Inasmuch as this Court has already decided to dismiss these cases pursuant to § 305, a discussion of whether or not to dismiss them under section 1112(b) of the Bankruptcy Code is superfluous. Furthermore, this Court does not feel it would be appropriate to dismiss this case for cause under section 1112(b).

Section 1112(b) of the Bankruptcy Code vests the Bankruptcy Judge with the authority to dismiss a case, on motion of a party in interest for cause. That section lists ten non-exclusive grounds as "cause" to dismiss a case.

The statute does not specifically mention that filing a petition for relief under Chapter 11 in bad faith, or with lack of good faith, is cause for dismissal. Courts looking to the history and the policies behind the Bankruptcy Code have concluded that bad faith is an appropriate ground to dismiss a Chapter 11 case. *See In re Victory Construction Co.,* 9 B.R. 549 (Bankr. C.D.Cal.1981).

■ There is no particular test for determining whether a debtor has filed a petition in bad faith. *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir. 1988). Courts have found bad faith when objective factors indicate that an attempt at reorganization would be futile. *In re Phoenix Piccadilly, Ltd.,* 849 F.2d at 1394; *In re HBA East, Inc.,* 87 B.R. 248, 258 (E.D.N.Y.1988). Other courts focus on the motivation behind the filing and view dismissal as appropriate when there is proof of subjective bad faith. *In re Kerr,* 908 F.2d 400, 404 (8th Cir.1990); *In re Garsal Realty, Inc.,* 98 B.R. 140 (Bankr. N.D.N.Y.1989). Of course the filing of a Chapter 11 case that has no chance of success is an indication in and of itself that a petition was filed without the honest intention to reorganize. A test utilizing a

combination of both objective and subjective factors has also been used. *Carolin Corp. v. Miller,* 886 F.2d 693, 701 (4th Cir.1989).

■ In determining whether cause exists to dismiss under § 1112(b) it is necessary to look to the facts and circumstances of each particular case. However many courts note that there are circumstances typical of most cases filed in bad faith which are indicia that the petition for relief should be dismissed. *See Matter of Little Creek Development Co.,* 779 F.2d 1068 (5th Cir.1986); *In re HBA East, Inc.,* 87 B.R. at 259.

■ One such circumstance is the single asset debtor which files on the eve of foreclosure. Judge Schwartzberg in *In re Pine Lake Village Apartment Co.,* 16 B.R. 750 (Bankr.S.D.N.Y.1982) candidly observed that most Chapter 11 cases involve exactly that scenario. Nonetheless, it is recognized that seeking the protection of the automatic stay to derail a foreclosure is only appropriate when the Debtor intends to and has the wherewithal to reorganize.

In this case, each Debtor owns either an apartment building and/or unsold condominium units. Summary judgments of foreclosure have already been granted to the secured creditors. Although the Creditor Partnerships were not looking to foreclose immediately, a settlement of the foreclosure action which is perceived as contrary to the Petitioner's interests was on the verge of consummation. The timing of the petition suggests it was filed to forestall the Settlement Agreement. Furthermore, due to lack of funds, a successful reorganization is not likely.

■ Also signalling a bad faith filing is a petition filed where a secured creditor has a lien on all the assets and the amount of unsecured debt is nominal. *See In re Phoenix Piccadilly, Ltd.,* 849 F.2d at 1394. Moreover, a request for relief made at the time a state court litigation between the debtor and creditor has reached a standstill is also suspect. *See In re HBA East, Inc.,* 87 B.R. at 259. These two scenarios indicate that the petition was filed to resolve a two party dispute, or to

gain an advantage in litigation pending elsewhere.

■ The facts in these cases indicate that they were indeed commenced to resolve a two party dispute and to gain an advantage in pending state court litigation. In the case at bar the only creditors are the Creditor Partnerships. There is no unsecured debt. Also, the Petitioner is engaged in litigation in which his adversaries are Adam and Curtis Katz. The filings in these cases stay the actions pending in state court insofar as the Debtors are concerned. The Petitioner's proposed plan of reorganization or the steps proposed in the Chapter 11 cases are to have a trustee sue the Katzes, thus suggesting that these involuntary cases were commenced in this forum to resolve the actions now pending in state court.

■ That there is little or no cash flow or income to sustain a plan of reorganization or make adequate protection payments are factors prompting a court to dismiss as they indicate that an attempt at reorganization would be futile. *See Matter of Little Creek Development Co.*, 779 F.2d at 1073.

In these cases the Debtors have no equity in their properties, nor do they possess any unencumbered assets. There is no suggestion they have the cash flow to operate in Chapter 11 as debtors-in-possession nor fund a plan of reorganization. The Petitioner has not suggested that he can or will make any cash contribution to operate the Debtors. Looking to objective factors it is clear that attempts at reorganization would be futile.

Notwithstanding all of the foregoing criteria which would warrant a dismissal of these cases for lack of good faith, this Court is not so inclined to dismiss these cases on that basis. As mentioned above, courts look to both objective and subjective factors in order to determine whether a case should be dismissed for lack of good faith. Specifically, courts look to whether the petitioner has an honest intent to attempt a reorganization.

■ The facts and circumstances in these cases show that the Petitioner believed that Chapter 11 would provide the mechanism by which funds would be obtained through suits instituted against the Katzes by a trustee which would provide the wherewithal to effectuate a reorganization. This would negate a finding that the Petitioner had no honest intent to effectuate a reorganization. Hence, this Court is of the opinion that it is not appropriate to dismiss these cases for lack of good faith under § 1112(b). For the foregoing reason this Court is not inclined to award to the Movants the reimbursement of their attorneys fees, costs and damages pursuant to § 303(i). Any award of damages under this section rests in the court's sound discretion. *In re West Side Community Hospital Co.*, 112 B.R. 243 (Bankr.N.D.Ill. 1990). This Court in its sound discretion is of the opinion that in the absence of any frivolous motives or design on the part of the Petitioner, no fees, costs or damages will be awarded to the Movants.

## CONCLUSIONS

1. This Court has jurisdiction to decide this motion pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a) and is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. These cases are consolidated for administrative purposes pursuant to Bankruptcy Rule 1015.

3. These cases are dismissed pursuant to Section 305(a) of the Bankruptcy Code.

4. The Movants are not entitled to the reimbursement of their attorneys fees, costs and damages.

5. SUBMIT ORDERS CONSISTENT WITH THIS OPINION.