**In the Matter of RIMPULL CORPORA-TION, Alleged Debtor.**

**CASSCO MACHINING, INC., Payne Manufacturing, Inc., and Marmon/Keystone Corporation, Petitioners,**

v.

**RIMPULL CORPORATION, Defendant.**

**Bankruptcy No. 82-02474-3-11.**

United States Bankruptcy Court, W.D. Missouri, W.D.

Nov. 10, 1982.

Michael R. Roser, Kansas City, Mo., for petitioners.

Mendel Small, Kansas City, Mo., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER ABSTAINING FROM PROCEEDINGS UNDER SECTION 305 OF THE BANKRUPTCY CODE AND ACCORDINGLY DISMISSING CASE

DENNIS J. STEWART, Bankruptcy Judge.

This is an action brought by the petitioners, who are creditors of the alleged debtor in varying amounts, to have the debtor adjudicated as an involuntary debtor under the provisions of section 303 of the Bankruptcy Code. In its answer to the involuntary petition, the debtor denies that it is "generally not paying such debtor's debts as such debts become due" within the meaning of section 303(h)(1) of the Bankruptcy Code and, further, requests abstention by the bankruptcy court from this case under the provisions of section 305 of the Bankruptcy Code.

After joinder of the issues by the pleadings, a trial of the issues of whether the debtor is paying its debts as they become due and of the issues underlying the request for abstention came on before the bankruptcy court for hearing on October 22, 1982, in Kansas City, Missouri. Thereupon, the petitioners appeared by Michael R. Roser, Esquire, their counsel, and the alleged debtor corporation appeared by its counsel, Mendel Small, Esquire. A plenary evidentiary hearing was conducted, and, on the basis of the evidence which was then adduced, the following findings of fact are made.

### Findings of Fact

Rimpull Corporation manufactures and sells bottom and rear-dump vehicles, and related parts, to the mining industry. It was organized in the year 1971 by Richard Manuel Davis, who since February 1971 has been the chief executive officer and major stockholder. As of the date of the hearing on October 22, 1982, Mr. Davis was holder of 99% of the outstanding stock, the only director and the president of Rimpull Corporation. Mr. Davis is responsible for all the business and operations of the organization. The business of Rimpull was not profitable during the years of its early existence. It first turned a profit in 1974 when its sales totaled $2,800,000.00 for the year. Over the years which followed, sales continued to increase as follows:

| | |
|---|---|
| 1975 | $4,700,000.00 |
| 1976 | $4,900,000.00 |
| 1977 | $8,400,000.00 |
| 1978 | $12,200,000.00 |
| 1979 | $12,100,000.00 |

Beginning in 1980, apparently because of a decline in the mining industry generally, sales commenced to decline. In 1980, total sales were $9,700,000.00. In 1981, they were $5,700,000.00. And, to date in 1982, the total sales have been, according to the uncontradicted testimony of Mr. Davis, $6,500,000.00 or $6,600,000.00.

Accordingly, the last profitable year for Rimpull Corporation was the year 1979. The loss for 1980 was $606,584.00. For 1981, it was $1,510,322. For the first six months of 1982, the loss has been $914,-885.00. According to the testimony of Mr.

Davis, it is hoped that an additional loss of only $50,000.00 will be suffered for the remaining months of 1982. The projected loss for the entire year 1982 is $1,100,000.00.

Additionally, as of December 31, 1981, Rimpull Corporation was the debtor on several large notes. One of these was a note in the total sum of $800,000.00, owed to the Commerce Bank of Kansas City. This note was a note originally issued by the General Capital Corporation, which had been the parent corporation of Rimpull Corporation but was merged into Rimpull. As a result of the merger, the obligations of General Capital Corporation became those of Rimpull. As to this particular obligation, it was secured by all the stock of Rimpull Corporation and a $250,000.00 note of Rimpull Corporation, which note is said to represent a temporary working capital loan. Additionally, the note was guaranteed by Mr. Davis, the major stockholder and chief executive officer of Rimpull Corporation.

Another indebtedness to the Commerce Bank of Kansas City is represented by a demand note dated January 31, 1982, in the total principal sum of $2,770,000.00. Rimpull Corporation has given no security for this loan.

A third large obligation is that owed to Mr. Davis, the major stockholder and chief executive officer, in the sum of $1,015,000.00. This is an unsecured indebtedness which, according to Mr. Davis' uncontradicted testimony, represents loans of working capital over the last four to six years. He also states that the last payment on the loan was made on May 31, 1982, and consisted solely of an interest payment. No payment of principal has been made to Mr. Davis in the last twelve months. According also to Mr. Davis' testimony, Rimpull Corporation leases a building from him at 157th Street and highway 169. As of June 1982, he reduced the rent which Rimpull is to pay him from $6900 per month to $5,000 per month. He intends to forgive any indebtedness for the difference "so long as Rimpull stays out of chapter proceedings." No other indebtedness for rent is currently owed by Rimpull to Mr. Davis.

All told, the indebtedness of Rimpull Corporation amounts to some $6,504,000.00, including that to the "trade creditors," including the petitioners in this case. The indebtedness to the petitioner Cassco Machining, Inc., is $24,280.70 plus interest. That to the petitioner Payne Manufacturing, Inc., is $32,257.50 plus interest. And $1,819.10 plus interest is owed to the third petitioner, Marmon-Keystone Corporation.

Between December 31, 1981, and June 30, 1982, the debt of Rimpull Corporation to its suppliers, the "trade creditors," increased from $375,399.00 to $1,919,768.00. Over the same period of time, the comparative ratio of current indebtedness to other indebtedness declined from 1.07 to .76. As of June 30, 1982, Rimpull Corporation had a negative net worth of $1,265,218.00. And, as of July 31, 1982, Rimpull had debts to "trade creditors" of $843,920 that had been owed for 90 days or more. According to the uncontradicted testimony of Mr. Davis, it is not unusual in the particular trade or business for accounts payable to be owed for 90 days or more.

The accounting firm of Arthur Andersen and Company issued an auditor's report on Rimpull Corporation as of December 31, 1981. *Inter alia,* the report stated as follows:

"As shown in the financial statements, the Company incurred net losses of $606,584 and $1,510,322 during the years ended December 31, 1980 and 1981, respectively. In addition, at December 31, 1981, the Company has a total of $3,695,000 in demand notes. These factors indicate the Company may be unable to continue in existence. Realization of the investments in inventory of $3,848,687 and equipment of $200,221 is dependent upon the success of future operations. The financial statements do not include any adjustments relating to the realization of these investments that might be necessary should the Company be unable to continue in existence."

In order to contend with this financial situation, Rimpull Corporation has, according to the testimony of Mr. Davis, inaugu-

rated a "severe retrenchment program" to reduce costs and the scale of operations. Further, Rimpull sought to place in effect a plan for dealing with the great range of outstanding debt. As an initial step, Rimpull paid the $800,000.00 debt to Commerce Bank. According to the testimony of Mr. Davis, Rimpull paid off these obligations so that Commerce Bank could not use the Rimpull stock, which was the security for the $800,000 debt, to control the debtor corporation and possibly cause it to be liquidated. Likewise, according to Mr. Davis' testimony, payment of this debt ensured autonomy by having the additional effect of preventing Commerce Bank from exercising control over him personally because of his personal guarantee of the loan. The indebtedness was paid in June 1982, a date within 90 days of the date of the filing of the petition for relief in this case. Accordingly, the petitioning creditors contend that this payment constitutes an avoidable preference within the meaning of section 547 of the Bankruptcy Code or possibly a fraudulent transfer within the meaning of section 548 of the Bankruptcy Code.

As to the remaining indebtedness of $2,770,000 to Commerce Bank, the debtor proposed to pay Commerce Bank the sum of $200,000 forthwith and to give Commerce Bank a note in the sum of $1,770,000 which should not bear interest and which would have no maturity date, but would be secured by a security interest in inventory of Rimpull Corporation which is slow moving and which has significant value, according to the testimony of Mr. Davis, if Rimpull Corporation commences to manufacture off-road vehicles on a permanent basis. Otherwise, according to this arrangement, the alleged debtor would maintain with Commerce Bank an $800,000.00 line of credit which would not be cancellable over a period of three years. This would be secured by a security interest in the cash, inventory, and accounts receivable of the Rimpull Corporation.

Under the date of July 16, 1982, the alleged debtor transmitted the following letter to its creditors:

"As you are aware, Rimpull Corporation has recently had difficulty paying invoices from your company within normal credit terms. We have been in existence for many years and have always felt an equal obligation to both suppliers and customers so be assured that this situation is as distressing to us as it has been for you. The purpose of this letter is to help you better understand our situation and outline our plan for corrective action. "The dramatic downturn in the mining equipment industry has had a serious impact on our company over the past several months and has resulted in a sharp decline in new truck sales and a drop in parts sales as well. The new truck sales which the company has been able to get have been only marginally profitable. Also hurting Rimpull's liquidity is a heavy production inventory in the several million dollar range consisting of parts which are used to make trucks operated primarily by the copper and iron ore industries which we estimate are unlikely to be sold in the near term. Most of the rest of the company's assets consist of inventory of service parts, specifically fabricated for our trucks, which can only be converted to cash when purchased by out customers—many of whose mines are currently either closed, or working short work turns.

"*Despite these problems, Rimpull intends to continue to operate and stay in the mining equipment business, both as a manufacturer of trucks and a supplier of parts to its customers.* In order for Rimpull to be successful in its efforts, we need the help of our customers, suppliers and lenders.

"We have already taken some positive steps in this direction and want to bring you up to date on them.

"(1) We have retained an investment banker with experience in our industry who has worked with us in developing a program to (a) significantly reduce operating costs, (b) generate a positive cash flow from operations going forward each month, and (c) to restructure our indebtedness with the bank and our suppliers.

"(2) Our bank, the Commerce Bank of Kansas City, has agreed in principle to restructure its debt with us, assuming the trade restructuring program described below is successful. Specifically, the bank has agreed to restructure $1,770,000 of its $2,770,000 loan to a long term loan *payable only* out of the proceeds of approximately $2,000,000 of slow and non-moving production inventory. In other words, if the inventory is not used or sold, the bank does not get paid. The bank has also agreed to restructure $800,000 of the remaining $1,000,000 as a three year revolving credit and be paid only $200,000 in cash at the time the agreement is finalized. In the unlikely event that Rimpull does not continue to operate for the next three years, the total amount of the bank debt would have priority over the claims of the unsecured creditors. At the present time, our analysis indicates the liquidation value of all the company's assets would be less than the bank debt.

"This agreement with the bank frees up cash to pay trade debts which would not otherwise be available for that purpose, and we appreciate their confidence in Rimpull's ability to weather the current tough economic climate in the mining industry.

"We are therefore proposing to you, as an important supplier with whom we hope to continue to do business, the following restructing plan, which is the same proposal that we are offering to all other unsecured trade creditors who are owed more than $1,500.

"We are asking you to accept in lieu of your existing trade debt, a note equal to 100% of the debt, payable in ten equal installments at six month intervals over the next five years, without interest. The first payment of 10% would be made in cash upon your acceptance of this proposal.

"If our cash flow builds up faster than we anticipate, it would be our intent to accelerate the payment of the notes, but we cannot make any commitment to do so at this time.

"We are aware of the impact that this deferral may have on your business and are deeply sorry. We also understand that you may not wish to extend credit to us for this period of time so we have provided a second alternative. Under this alternative, in full settlement of all obligations owed by Rimpull to your firm Rimpull would pay you 40% in cash, 25% upon acceptance and 15% in four months. Again, this same proposal is being offered to all unsecured trade creditors over $1,500.

"I hope that you will work with us on these proposals. I wish we had more money to be able to pay you more. All I can say is that we intend to be in business for a long time, and I hope that the benefits of our future business with you will help offset some of this problem.

"We feel that this plan is the best we can offer. We feel it is very important that we make commitments to you that we can meet under most reasonable projections of economic and business activity.

"We have consulted with our attorneys in reviewing the possible alternatives that exist for handling the claims of creditors. It appears that the only alternative to the plan of payment proposed above is the filing of an Arrangement Proceeding (Chapter XI) in the federal courts which would only further delay payment. In addition, the costs inherent in such a proceeding would undoubtedly result in payments significantly less and significantly later than those proposed above. We hope that our creditors will go along with our payment plan so that we will not be forced to seek temporary protection of the Court.

"Please do not hesitate to call if you have any questions. We have attached for your convenience an acceptance agreement form for either alternative above which we would appreciate your signing and returning to us as soon as possible. We will promptly make payment to you upon receipt of this form duly executed.

"We appreciate your cooperation in this difficult situation. With your patience and cooperation it will be corrected."

According to Mr. Davis' uncontradicted testimony, 67% of the number of the trade creditors and 76% in amount the trade creditors have to date indicated their acceptance of the arrangement described in the above quoted letter. But the petitioning creditors, who are among the trade creditors, have brought this suit for the entry of an involuntary order of relief under title 11, United States Code, for the Rimpull Corporation.

### Conclusions of Law

#### Abstention

Section 305 of the Bankruptcy Code provides that the court, "after notice and a hearing, may dismiss a case under this title ... at any time if ... the interests of creditors and the debtor would be better served by such dismissal or suspension." According to the legislative history under that section, "(t)he court may dismiss or suspend ..., for example, if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment." Considered under these standards, the case at bar is a paradigm case for abstention by the court of bankruptcy. An arrangement has been worked out by the debtor with its creditors; it has been accepted by a vast majority of the creditors; the money is in place to fund a major part of the arrangement[1]; and

only a minority of creditors have dissented from the arrangement and have filed the petition at bar requesting an involuntary adjudication.

The petitioning creditors, however, assert that there are factors present in the case at bar which distinguish it from the exemplar case described in the legislative history to section 305 of the Bankruptcy Code. They contend that, unless the involuntary order for relief is entered, the $800,000 payment to Commerce Bank, made within 90 days of the date of the filing of the involuntary petition, would be "insulate(d) ... from judicial scrutiny and probable avoidance." But, in making the determination of the issue of abstention, the court must be mindful of the primary standard to be applied, i.e., whether abstention will be in the best interest of the creditors and of the debtor as well. According to the nonjudicial arrangement now offered the creditors, they all, at their option, can be paid 100% of the existing indebtedness, albeit without interest in the case of the "trade creditors." Thus, even if the prepetition payment of $800,000 is in fact "insulated from judicial scrutiny," an unfair or undesirable result is not achieved thereby. It is still proposed, and with some degree of realism, that the creditors will be paid 100% of their principal. Therefore, the court cannot conclude that, for this reason, abstention would not be in the best interests of the creditors and the debtor.[2]

The petitioning creditors, however, next contend that the creditors would receive more in liquidation under the Bankruptcy

1. According to the alleged debtor's uncontradicted claims in this regard, it currently has on hand "$985,000 in cash or cash equivalents" with which it "can carry out the ... composition and extension and give all of its trade creditors at least 40¢ for each dollar of debt it owes to them." Brief in Support of Motion for Abstention Pursuant to Section 305 of the Bankruptcy Code, filed October 28, 1982, p. 3.

2. It must be observed that, in circumstances like those at bar, when, even without recovery of the alleged preference, the creditors are proposed to be paid 100% (or at least as much as they would receive in liquidation if the preference were recovered), the preference statute cannot be said implacably to call for recovery. It is recognized in section 547(b)(5) of the

Bankruptcy Code that a payment which is otherwise a preference need not be recovered if the creditor is not thereby accorded more than he would otherwise receive in title 11 proceedings. According to the considerations stated in the text of this memorandum, it cannot be forecast at this point that Commerce Bank is receiving under the current arrangement any more than it would receive in title 11 proceedings. And, further, under the terms of the fraudulent conveyance statute, section 548 of the Bankruptcy Code, it is recognized that antecedent debts may constitute such consideration as will ordinarily prevent a payment from being considered to be fraudulent. See section 548(d)(2).

Code than they would in the arrangement which is now being offered them. In this regard, the analysis of the petitioning creditors is as follows:

"If the $800,000 payment made to Commerce in June 1982 were avoided, Rimpull's cash position would be $1,800,000. Rimpull's non-cash assets include accounts receivable ($475,000), inventory ($3,000,000 at cost), and machinery and equipment ($158,000 net of depreciation). Rimpull's trade creditors would be limited to a 40% recovery only if liquidation of Rimpull's non-cash assets, less administration expenses, produced $801,600. This represents 22% of the book value of Rimpull's non-cash assets."

It must be remembered, however, as a signal point that the arrangement being offered to the trade creditors will grant them 100% payment, at their option, if they are willing to wait as much as five years for the full payment of their debt, which will be paid in six month intervals over that five-year period. They need be limited to 40% recovery only if, *at their option,* they elect to receive payment within four months. And, if the figures contained in the above analysis can be accepted as correct, payment through liquidation, even if the full "book value" referred to can be obtained, would result in far less than 100% payment to the "trade creditors."[3] Nor is it altogether likely that the time factor would be improved upon, when, according to the evidence, operations must continue for some time in order that much of the property can retain its present "book value."

Next, however, the petitioning creditors contend that it is unlikely that the debtor corporation can long continue in business, in view of their continuing losses, their declining sales and the opinion of Arthur Andersen and Company that "the Company may be unable to continue in existence." But there are factors which ameliorate this dim view, including the obtaining of new finance, a retrenchment program which will reduce overhead, the reduction of Mr. Davis' salary to zero and the proposed subordination of the corporation's indebtedness to him in part and the foregiveness of it in remaining part. Now that these principal factors have come into existence, the company can point with some justification to a possibility of minimizing losses for the remainder of 1982 and perhaps reversing the trend in the near future.

The petitioning creditors contend that the arrangement benefits Commerce Bank and Mr. Davis, but is detrimental to the other creditors. They state in this respect as follows:

"(T)he workout that Rimpull proposes would very nearly assure payment in full of the debt owed to Commerce. It would also require trade creditors to accept a 60% discount of the debts due them. In these Bankruptcy Code proceedings, Rimpull could propose a plan of reorganization that accorded differing treatment to the debt owed to Commerce and the debts owed to trade creditors. But, the plan of reorganization could not be confirmed unless each trade creditor received at least the amount that would be received in a liquidation proceeding. Bankruptcy Code section 1129(a)(7). It is reasonably likely that trade creditors would realize substantially more than 40% of the debts due them in a liquidation proceeding."

As the court has previously pointed out, however, the trade creditors may elect to receive 100% of their debts under the arrangement being offered them. The entire indebtedness of Commerce Bank will be paid, albeit the bank also may have to sacrifice some interest, and it will be paid as a matter of priority over the debts of the trade creditors. But Commerce Bank, according to the evidence which has been adduced to this court, will provide the financing which is necessary to the continuation of the business and the potential of a

---

**3.** According to the figures set out in the petitioning creditors' posthearing brief, the potential liquidation value of the alleged debtor's assets would be $5,433,000. The outstanding debt is $6,504,000. Even given the book values, therefore, over a million dollars worth of debt would be left unpaid by straight liquidation. And it must be further considered that the liquidation values, as observed by the auditor's report, may be vastly lower by reason of the discontinuance of operations by the debtor.

100% payout to all the trade creditors who elect it. Under these circumstances, the Bankruptcy Code recognizes that it would be fair to grant the financing creditor some priority in payment. And it must also be recognized as fair under the circumstances of this case.

According to the evidence which is before this court, it cannot be concluded that the arrangement favors Mr. Davis, the chief executive officer of Rimpull Corporation. It is true that it proposes to keep Rimpull Corporation in business and to impose some sacrifice upon the creditors in order to do this. But, according to the uncontradicted evidence before this court, Mr. Davis will also undergo some sacrifice, subordinating virtually all the corporate debt owed to him to all of the other indebtedness and continuing to serve as the chief executive officer of Rimpull Corporation without pay.

In view of the foregoing facts and considerations, this court cannot discern any significant distinction between the arrangement at bar and those which were approved and provided the basis for dismissal or abstention in the cases cited and relied upon by the petitioning creditors.[4]

For the foregoing reasons, this court concludes that abstention and consequent dis-

missal would be in the best interests of the debtor and the creditors within the meaning of section 305 of the Bankruptcy Code. Having so concluded, the court need not treat of the issues presented under section 303 of the Bankruptcy Code.[5]

It is therefore, accordingly,

ORDERED that, as a matter of unreviewable abstention pursuant to section 305 of the Bankruptcy Code, this case be, and it is hereby, dismissed.

---

4. See, e.g., *Matter of Win-Sum Sports, Inc.,* 14 B.R. 389 (Bkrtcy.D.Conn.1981), in which the fundamental operative fact, i.e., that the debtor proposed with some realism to pay all the outstanding debt, was the same as in the case at bar. The distinctions pointed out by the petitioning creditors in their brief are not material to this action. The same thing is essentially true of *Matter of Luftek,* 6 B.R. 539, 547 (Bkrtcy.E.D.N.Y.1980) ("(M)any of its creditors have consented to (abstention), ... it would lose a substantial amount of its receivables if it is forced out of business as a result of bankruptcy liquidation, ... the petition was joined by the subsidiary of one of its competitors, and ... it has entered into a commitment for a loan which would enable it to privately reorganize its debts and pay its creditors in full. Virtually all the same material points of agreement between this case and that of *In re Bailey's Beauticians Supply Co.,* 671 F.2d 1063 (7th Cir.1982), can be noted. Full disclosure has been accomplished in the case at bar by means of the evidence adduced in the hearing of October 21, 1982. Nor can it be regarded as decisive that in the *Bailey's Beauticians* case, *supra,* the debtor's assets were being administered by an "independent third party," i.e., an

assignee for the benefit of creditors. Even in cases under the Bankruptcy Code, it is recognized in the concept of the debtor-in-possession that it is desirable, when it is in the interest of the debtor and creditors to do so, to allow a debtor to administer its own assets.

5. If the court were required to make a finding on this issue, it could not be said that there has been any clear showing that the debtor is not making its payments "as such debts become due." There was no showing of any maturity date of the outstanding and unforgiven debts. It was shown that there were some $800,000 in aged trade debts of a vintage of 90 days or so. But it was also shown that payment in excess of 90 days was nothing unusual in the custom and usage of the trade. No contracts were adduced or otherwise evidenced which would permit a finding that the trade debts were past due. That debt of the petitioning creditors is alleged, as of the date of the filing of the petition, to be "immediately due and payable," but no evidence has been adduced to demonstrate any certain maturity date or due date of the indebtedness.