**In re IOWA TRUST, Debtor.**

**Bankruptcy No. L-92-00022C.**

United States Bankruptcy Court, N.D. Iowa.

Jan. 13, 1992.

---

Tom Riley and Peter Riley, Tom Riley Law Firm, Cedar Rapids, Iowa, for Iowa Trust.

Eric Lam, Moyer & Bergman, Cedar Rapids, Iowa, for Thomas McCuskey, trustee.

U.S. Trustee's Office, Wesley Huisinga, U.S. Trustee, Janet Reasoner, Asst. U.S. Trustee, Cedar Rapids, Iowa.

Office of the Iowa Atty. Gen., Scott Galenbeck, Asst. Atty. Gen., Des Moines, Iowa.

H. Richard Smith and Wade R. Hauser, III, Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, Des Moines, Iowa, for City of Dubuque.

Patrick W. Brooks, Brooks, Ward & Trout, Marshalltown, Iowa, for City of Marshalltown.

## RULING RE: DISMISSAL OF CASE

MICHAEL J. MELLOY, Chief Judge.

The motions of David J. Lyons, Commissioner of Insurance for the state of Iowa, and receiver for the Iowa Trust ("Receiver"), and the City of Dubuque, Iowa ("Dubuque") to dismiss this case came on for hearing on January 9, 1992. At the conclusion of the hearing, the Court entered an order on the record granting the motions to dismiss. This Court now supplements the record made at the hearing on January 9, 1992, with written findings of fact and conclusions of law.

### Procedural Background

This case is unique in several respects. Not the least of those is the manner in which the case was filed and the expedited hearings and ultimate dismissal of the case. Three of the four trustees of the Iowa Trust met in the law offices of the Tom Riley Law Firm on Sunday afternoon, January 5, 1992. The trustees voted to authorize a Chapter 7 filing on behalf of the Iowa Trust. The case was filed shortly thereafter at the home of the Clerk of the Bankruptcy Court on Sunday afternoon, January 5, 1992, at 3:26 p.m.

On Tuesday, January 7, 1992, the Receiver filed a motion to dismiss this case. The undersigned held a telephonic conference call on the afternoon of January 7, 1992, with counsel for the Receiver, the debtor, the Chapter 7 trustee, and the U.S. Trustee to arrange for the scheduling of the hearing on the motion to dismiss. The Receiver's attorneys argued strenuously that this matter should be handled as expeditiously as possible due to the multitude of pending litigation involving the Iowa Trust in various jurisdictions around the country. Consequently, the Court scheduled a hearing on the motion for the afternoon of January 9, 1992. While the telephonic conference on scheduling of the Receiver's motion was being held, the city of Dubuque filed its own motion to dismiss and request for expedited hearing. Accordingly, the order setting the hearing for January 9, 1992, included a provision that Dubuque's motion

would be heard at the same time. The Clerk of the Bankruptcy Court then gave notice of the hearing to all interested parties, including all creditors listed in the bankruptcy schedules.

The hearing on January 9, 1992, lasted from approximately 2:00 p.m. until 9:00 p.m. At the conclusion of the hearing, this Court stated on the record that the case would be dismissed and briefly outlined the reasons why dismissal was appropriate under 11 U.S.C. § 305. The undersigned went on to state that the dismissal would become effective immediately and that the oral ruling would be supplemented by written findings of fact and conclusions of law. A short written order dismissing the case and a judgment of dismissal were entered on the morning of January 10, 1992.

### Findings of Fact

1. The Iowa Trust is an entity created pursuant to Chapter 28E of the *Iowa Code* to receive and invest local government surplus funds. Participation in the trust is limited to public entities which are defined in the trust indenture as "... any city, county, public utility, or other political subdivision of the state, or any department, agency, or instrumentality thereof, or any political or public corporation thereof, existing as a local government entity under the laws of the state of Iowa...." The ultimate supervisory control over the Iowa Trust is vested in the supervisory board which is comprised of one authorized representative from each of the participating public entities. The supervisory board elects four trustees vested with the power to exercise control and authority over the trust and trust property.

2. The Iowa Trust has approximately 88 participating public entities. Those public entities include various counties, cities and towns, judicial districts, public improvement districts, and local utilities. Those public entities have over $100 million invested in the Iowa Trust.

3. The genesis of the problems with the Iowa Trust which resulted in the Chapter 7 filing is well known to most Iowans from the widespread publicity the trust has generated. Briefly stated, the problems with the trust emanate from misappropriation of trust funds by the investment advisor, Institutional Treasury Management ("ITM"). Approximately $75 million of the funds invested by the public entities in the Iowa Trust are missing. Various federal and state investigative agencies have traced the missing funds to other accounts managed by ITM.

4. Approximately $32 million of funds in the Iowa Trust remained in the trust account when the diversion was discovered. That money was initially frozen as a result of an order entered in a lawsuit filed by the Securities and Exchange Commission in the United States District Court in California.

5. When the losses in the Iowa Trust first came to light, there were two immediate concerns. The first concern was to obtain a lifting of the freeze on the $32 million which remained in the Iowa Trust and to make provision for distribution of those funds to the trust participants. The second concern was to trace the remaining funds and to aggressively pursue return of those funds to the trust. It is the understanding of the Court that the trustees immediately began to pursue these two matters and contacted legal counsel about representing the trust in the California litigation and other legal matters arising out of the disappearance of the funds.

About the same time, the various municipalities and counties apparently made contact with the offices of the Iowa Governor and Attorney General. The deputy attorney general in charge of the Iowa Trust matter for the Attorney General's Office testified that late in the day on December 13, 1991, a meeting was held in the offices of the Governor and the decision was made that the resources of the state of Iowa would be committed to assisting the trust in recovery of the trust assets.

6. It was specifically determined that the state would offer to have the Iowa Insurance Commissioner serve as a receiver for the trust if the Iowa District Court determined that appointment of a receiver was appropriate. The Insurance Commissioner was selected as the state official to act as receiver because his office has had

experience in handling receiverships in the liquidation of insolvent insurance companies. In addition, the state made the resources of the Iowa Attorney General's Office available to the trust to pursue the recovery of the missing funds.

7. On December 17, 1991, Dubuque filed a Petition in Equity in the Iowa District Court for Polk County in which the Iowa Trust and the individual trustees were named as defendants. In that suit, Dubuque prayed for immediate removal of the individual defendants as trustees of the Iowa Trust, appointment of a receiver, and an accounting and return of Dubuque's full interest in the Iowa Trust. Dubuque's Petition in Equity was set for a status conference on the morning of December 19, 1991. The testimony shows that at that status conference various exhibits were introduced into evidence and an oral motion was made to amend Dubuque's Petition in Equity to request that David J. Lyons, Commissioner of Insurance, be immediately appointed as receiver. As a result of that hearing, the Honorable Michael J. Streit, Judge of the Iowa District Court in and for Polk County, entered an order appointing David J. Lyons as receiver for the Iowa Trust. The order included the following provision: "... the powers and duties of the defendant trustees are suspended during the receivership, and the receiver shall exercise all such powers and duties of the trustees as provided in the indenture of trust...." The attorney for the individual trustees of the Iowa Trust has filed a petition for writ of certiorari with the Iowa Supreme Court challenging Judge Streit's order. At the hearing in this Court, the debtor and the Chapter 7 trustee attempted to raise the issue of the validity of Judge Streit's order. This Court, however, indicated that Judge Streit's order is a binding and valid order for all purposes in this proceeding and that this Court would not entertain any collateral attack upon Judge Streit's order. If the Iowa Trust trustees continued to be dissatisfied with Judge Streit's order, their only recourse is with the Iowa Supreme Court, not this Court.

8. The testimony shows that the Receiver has from 3 to 5 persons in his office working on the receivership of the Iowa Trust on a full-time basis. The office of the Iowa Attorney General has committed 2 to 3 attorneys who are currently working full-time on Iowa Trust litigation and a variety of others working part-time. Both parties testified that "full-time" means greatly in excess of 40 hours per week. Many of the state employees have been working on this matter for many hours a day, seven days a week, since the state became involved. The testimony indicated that at any given time, up to 9 attorneys, employed by the state and working at no cost to Iowa Trust, may be rendering legal services in Iowa Trust matters.

9. Gordon Allen, deputy attorney general, who is supervising the Iowa Trust matters, outlined the work that has been done to date by the Attorney General's Office and the extent of the ongoing litigation. Briefly stated, this work includes:

a. Representing the Receiver in the Iowa District Court receivership.

b. Intervention in the SEC action in California to obtain a lifting of the freeze on the Iowa Trust assets.

c. Cooperation with the SEC and conduct of its own independent investigation to trace the assets of the Iowa Trust. Those efforts have been largely successful. The Receiver has been able to trace all, or virtually all, of the assets of the Iowa Trust into other accounts under the management and control of ITM.

d. The litigation in the Iowa Supreme Court on the trustee's petition for writ of certiorari.

e. Extensive litigation in the United States District Court for the District of Colorado. The tracing of the Iowa Trust assets revealed that approximately $44 million had gone into an account managed by ITM for the benefit of Jefferson Bank and Trust, located in the state of Colorado. The Attorney General's Office filed a suit in the United States District Court for the District of Colorado requesting a temporary restraining order on any disposition of the $44 million transferred to the Jefferson Bank. The TRO was denied but the judge

in Colorado set an expedited hearing on a preliminary injunction to be heard on the federal holiday of January 20, 1992. The judge also ordered expedited discovery. Consequently, the Attorney General's Office currently is conducting discovery in a number of jurisdictions, including California, Colorado, and New York; is taking document and witness depositions; and is preparing for the January 20, 1992 hearing. It is the opinion of the Attorney General's Office that the January 20, 1992 hearing may be the crucial hearing on the issue of whether it will be successful in obtaining recovery of the $44 million from the Jefferson Bank.

f. The tracing of assets shows that money was transferred into the accounts of various cities in California. Those cities also had money invested with ITM. The Attorney General's Office is continuing its investigation of those transfers and discussing the various legal remedies available to it in an attempt to obtain recovery of those funds.

g. There is approximately $23 million in a Shearson Lehman brokerage account. There is a question as to the ownership of those funds and Shearson has filed an interpleader action seeking to join Iowa Trust as a party. The Attorney General's Office is preparing to file an answer to the interpleader action and is working diligently in an attempt to obtain as much of the $23 million as possible for the benefit of the Iowa Trust.

h. The Attorney General's Office also is investigating all other potential claims, including possible claims against banks, lawyers, brokers, custodial banks, etc.

11. The Attorney General's Office has consulted with attorney Tom Flynn concerning the bankruptcy options available to the Receiver. The Attorney General's Office is continuing to review bankruptcy on an on-going basis. Mr. Allen testified the decision was made that a bankruptcy filing is premature at this time. The Receiver and Attorney General's Office have decided that it would be preferable to distribute the $32 million of assets on hand prior to filing a bankruptcy. It may ultimately be determined that the trustee's strong arm powers, particularly the § 547 preference avoidance power, may be significant to the Iowa Trust and may ultimately warrant a bankruptcy filing. The Attorney General's Office is aware of the time limits for setting aside preferences and will make a decision within the applicable time limits.

It is the opinion of the Attorney General's Office, in consultation with Mr. Flynn, that if a bankruptcy filing is necessary that the most economical course of action would be to file a Chapter 11 petition in the United States Bankruptcy Court for the Southern District of Iowa. The Attorney General's Office would then seek to have the Receiver remain in place as a debtor-in-possession under Chapter 11 with the Attorney General's Office acting as his attorney. In this manner, any fees for a bankruptcy trustee or attorney for the bankruptcy trustee could be avoided.

12. The Receiver has also been working diligently to discharge his receivership duties. The Receiver has taken possession and control of all the records of the Iowa Trust and has been working to verify each public entity's account balance in the trust. The Receiver has taken control of the $32 million which remained in the Iowa Trust and has invested that money in Iowa banks. The Receiver has made a partial distribution of approximately $9.5 million. The Receiver was preparing to make a second distribution of approximately $19.5 million and had filed a report with the Iowa District Court for Polk County recommending how that money was to be distributed. A hearing on the proposed distribution was scheduled for January 6, 1992. That hearing was canceled as a result of this bankruptcy filing on January 5, 1992.

It was the opinion of the Receiver and a number of public entity participants that had the hearing on Monday, January 6 gone forward as scheduled, that money could have been distributed on Tuesday, January 7 or Wednesday, January 8.

13. A highly significant factor to be considered is that both the Receiver (and staff members from the Iowa Insurance Division) and the Attorney General's Office

are charging no fee to the Iowa Trust for their respective services. These offices are spending several hundred hours per week on Iowa Trust matters. It is anticipated that there will be extensive litigation over the assets which have been transferred. In particular, the Attorney General's Office fully anticipates that the Jefferson Bank in Colorado will vigorously assert its ownership of the $44 million transferred to the Jefferson Bank and aggressively fight any attempt to recover that money for the Iowa Trust. Likewise, litigation over the transfers to the California cities, the alleged preferential transfer to Polk County, the Shearson interpleader action, and potential claims against brokers, custodial banks, lawyers, etc., will consume hundreds or probably thousands of hours of legal time.

While the Attorney General's Office was not able to put any definitive figure on the value of the services rendered, it is clear that privately retained counsel would charge hundreds of thousands, if not millions, of dollars for the extent and quality of the services rendered by the Attorney General's Office. Likewise, a privately retained receiver of a $100 million receivership, rendering services similar to those being performed by Mr. Lyon's office, could easily charge fees of tens of thousands of dollars.

14. The action by the individual trustees of the Iowa Trust to authorize the bankruptcy filing was done without consultation between the trustees and the trust participants. In fact, at least two of the public entities which employ (or did employ) two of the three trustees voting for the bankruptcy filing have gone on record as opposing the action taken by their representatives to the Trust Board. In addition, there has been almost unanimous opposition to this bankruptcy filing by the plan participants.

It is clear that the Receiver has developed a very good working relationship with the public entities involved in the Iowa Trust and their legal counsel. Those entities have indicated in filings and statements to this Court that they are very pleased with the Receiver's work to date, believe that the Receiver and the Attorney General's Office are on the right track, and are generally very supportive of the Receiver's efforts. The trust beneficiaries are quite pleased with the aggressive efforts which have been made to date and are very appreciative of the fact that these services are being rendered to the trust beneficiaries without any charge for legal or receivership fees.

15. This Court believes that part of the hostility to this bankruptcy proceeding is generated by the manner in which the case was filed. The trustees made the filing without consulting the public entities who had money in the Iowa Trust, made the filing one day before the parties believed they were going to receive a much needed distribution from the Iowa Trust, and filed the case in the Northern District of Iowa in Cedar Rapids, as opposed to the more obvious venue of the Southern District of Iowa in Des Moines. Since the trust clearly will be terminated upon completion of the recovery of assets and distribution to the trust beneficiaries, the creditors believe that they should have had more say in who, where, and when any bankruptcy filing would be made.

### Conclusions of Law

Both the Receiver and Dubuque have raised a number of grounds in support of their respective motions to dismiss. These grounds include dismissal for cause for the reason that the trustees lacked authority to authorize a bankruptcy filing because of Judge Streit's receivership order; the contention that Elaine Gundacker had been terminated by the city of Marshalltown prior to the January 5, 1992 meeting and, therefore, was no longer a member of the Iowa Trust board of trustees who could authorize a bankruptcy filing; an allegation that the Iowa Trust is a municipality as that term is defined in the Bankruptcy Code and not eligible for Chapter 7; and finally, that the Court should dismiss the case pursuant to the abstention provisions of 11 U.S.C. § 305.

The bulk of the testimony at the hearing on January 9, 1992, was directed to the § 305 issue. The attorneys for both the

Receiver and Dubuque requested that the Court dismiss the case pursuant to 11 U.S.C. § 305 and avoid reaching the other issues. In particular, the parties requested that the Court not address the issue of whether the Iowa Trust is a municipality, unless this Court determined that this was the only theory upon which the movants might obtain a dismissal. Both the Receiver and Dubuque made clear at the hearing that each wishes to keep the bankruptcy option available if possible and hopes this Court would not enter a ruling that might later be construed to prohibit a subsequent bankruptcy filing. The parties recognize that in a subsequent filing they may have to face the issue of whether the Iowa Trust is a municipality, but would rather wait to face that issue if and when the Receiver decides to make a voluntary filing.

This Court believes that the request of the Receiver and Dubuque is well taken. The Receiver and Dubuque have presented evidence which clearly demonstrates that this is an appropriate case to dismiss pursuant to 11 U.S.C. § 305. Accordingly, the Court does not believe it needs to address the very difficult issues of Ms. Gundacker's employment status, and the Board's authority under Judge Streit's receivership order, or the issue of whether the Iowa Trust is a municipality. The issue of whether the Board and Ms. Gundacker had authority to authorize the bankruptcy filing raises a number of difficult factual and legal issues of Iowa contract law, interpretation of the city of Marshalltown municipal ordinances, and consideration of federal bankruptcy law as to the effect of the state receivership proceedings. Both sides have presented authorities as to the effect of the receivership order which raise a number of legal issues. However, this Court believes that in the context of this expedited proceeding, and given the fact that such a compelling case was made for dismissal under 11 U.S.C. § 305, those issues need not and will not be addressed by the Court. Likewise, this Court is making no determination as to whether the Iowa Trust is a municipality.

11 U.S.C. § 305 provides as follows:

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension.

Many courts have observed that this remedy under § 305(a)(1) should be used as the "exception rather than the rule." *In re M. Egan Co., Inc.*, 24 B.R. 189, 191 (Bankr. W.D.N.Y.1982) (citing *In re Bioline Laboratories*, 9 B.R. 1013, 1023 (Bankr.E.D.N.Y. 1981) and *In re Luftek*, 6 B.R. 539, 548 (Bankr.E.D.N.Y.1980)). Courts interpreting and applying § 305(a)(1) have pointed out that the decision on whether to dismiss or suspend should be made on the facts of each individual case. *In re Trina Associates*, 128 B.R. 858, 867 (Bankr.E.D.N.Y. 1991) (citing *In re Fitzgerald Group*, 38 B.R. 16, 17 (Bankr.S.D.N.Y.1983) and *In re Artists' Outlet, Inc.*, 25 B.R. 231 (Bankr. D.Mass.1982)); *In re Fax Station, Inc.*, 118 B.R. 176, 177 (Bankr.D.R.I.1990) (also citing *Artists' Outlet* case). The focus on the individual facts of each case recognizes that the interests of the debtor and the creditors which must be weighed under § 305 are unique to each individual case.

A number of cases, however, have provided some guiding criteria or factors which courts may apply in determining whether a dismissal or suspension of proceedings is appropriate. One early case interpreting § 305(a)(1), summarized the factors and tests already in use as follows:

The Courts have placed great emphasis in invoking 11 U.S.C. § 305(a) on the economy of administration of a case, the need for additional administrative expenses, and the duplication of effort. See *In re Nina Merchandise*, 5 B.R. 743, 747 (Bkrtcy.S.D.N.Y.1980), citing *In re Lang*, 5 B.R. 371, 374 n. 4 (Bkrtcy. S.D.N.Y.1980). The cases note that one factor leading to abstention is the existence of a non-federal insolvency proceeding which has progressed so far as to make a bankruptcy duplicative and costly. *Id.* One Court has emphasized the guideline that abstention is most appropriate in an involuntary case. *In re Pine*

*Lake Village Apartment Co.*, 16 B.R. 750, 753 (Bkrtcy.S.D.N.Y.1982). Another Court has set up three necessary factors: (1) the petition was filed by a few recalcitrant creditors and most creditors oppose bankruptcy; (2) a state insolvency proceeding or out of court arrangement is pending; (3) dismissal is in the best interest of the debtor and creditors. *In re Rai Marketing Services, Inc.*, 20 B.R. 943, 6 C.B.C.2d 995 (Bkrtcy.D.Kan.1982). The pending proceedings which have been sufficient to invoke different courts abstention have been assignments for the benefit of creditors; *In re Bailey's Beauticians Supply Company*, 671 F.2d 1063 (7th Cir.1982), an Act case; State Court Receivership, *In re Sun World Broadcasters*, 5 B.R. 719 (Bkrtcy. M.D.Fla.1980); SEC equity receivership, *In re Starbuck*, 14 B.R. 134 (Bkrtcy. S.D.N.Y.1981)); Bulk Sale Agreement, *In re Bioline Laboratories*, 9 B.R. 1013 (Bkrtcy.E.D.N.Y.1981).

*In re M. Egan Co., Inc.*, 24 B.R. 189, 191 (Bankr.W.D.N.Y.1982). Subsequent cases focussed in on one particular factor or another. *E.g., Central Mort. & Trust, Inc. v. State of Texas (In re Central Mort. & Trust, Inc.)*, 50 B.R. 1010, 1021 (S.D.Tex. 1985) (focussing on efficiency and economy of administration and citing *In re Michael Starbuck, Inc.*, 14 B.R. 134, 135 (Bankr. S.D.N.Y.1981)). Many courts considering § 305(a)(1) motions in involuntary cases have looked to the following three-part test for determining whether dismissal is appropriate:

(1) The petition was filed by a few recalcitrant creditors and most creditors oppose the bankruptcy; (2) there is a state insolvency proceeding or an out-of-court arrangement pending; and (3) that dismissal is in the best interest of the debtor and all creditors.

*Trina Associates*, 128 B.R. at 867 (citing *In re Sherwood Enterprises, Inc.*, 112 B.R. 165 (Bankr.S.D.Tex.1989)); *In re Rai Marketing Services, Inc.*, 20 B.R. 943 (Bankr. D.Kan.1982); *In re Luftek*, 6 B.R. 539 (Bankr.E.D.N.Y.1980)). Recent cases have attempted to provide a comprehensive summary of the relevant factors and criteria

other courts have used for guidance in § 305(a)(1) decisions. *Trina Associates*, 128 B.R. at 867; *Fax Station*, 118 B.R. at 177. The *Fax Station* court summarized these criteria as follows:

Such factors generally include: (1) economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in a state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving the equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.

118 B.R. at 177 (and cases cited therein); *see also Trina Associates*, 128 B.R. at 867 (citing this list of factors). This Court agrees with the *Trina Associates* court that "[a]lthough the tests are useful, in determining whether dismissal under § 305(a) is appropriate, courts must look to the factors of the individual cases." 128 B.R. at 867. Hence, this Court will be guided by the unique facts of this case, and look to only the factors or criteria particularly relevant and applicable here.

The first observation this Court must make goes to the heart of the unique and unusual posture of this case for a § 305(a)(1) determination. Normally, the courts are very careful to balance both the debtor and the creditors' interests as specified under § 305(a)(1) in determining the appropriateness of dismissal. Here, however, the Court finds that this case, as filed, presents no recognizable debtor's interest to account for in this balancing. Iowa Trust does not seek to reorganize in this court, or even seek a fresh start. This is manifested in its filing for a Chapter 7 liquidation. Both sides agree that the only reason for keeping the Iowa Trust, as presently constituted, in existence is to recover

money to pay to its creditors. Upon completion of that process, all parties acknowledge the Iowa Trust will go out of existence. The debtor really has no independence interest, or interest at odds with, the interest of the creditors.

There is even consensus about the ultimate interest of the creditors. Both sides agree that the creditors' interest is getting the greatest amount of recovery in the most economical and efficient manner. The crux of the dispute deals with whether this particular bankruptcy proceeding is the best way to achieve that common goal. The trustees of the Iowa Trust who filed this bankruptcy petition believe that it is the best way to achieve what is ultimately the creditors' best interest. The Receiver and Dubuque contend that this bankruptcy, filed at this time, in Cedar Rapids, as a Chapter 7, with an appointed Chapter 7 trustee, is not in the best interest of the Iowa Trust creditors.

This Court wishes further to point out that the present dispute also is not about whether bankruptcy would ever offer benefits to achieving the ultimate goal of everyone involved in this case. There was much testimony and legal argument about the trustees "strong arm" power, the nationwide service of process, and the other benefits of bankruptcy. However, even the Receiver and Dubuque have acknowledged the potential benefits of a bankruptcy filing for the Iowa Trust. This dispute really is about whether this particular bankruptcy, at this particular time, is appropriate.

The positions of the Receiver and Dubuque that under § 305(a)(1) "the interests of creditors [in this case] ... would be better served by dismissal" has received the overwhelming support of the majority of the creditors in this case. The Court believes that this degree of support along with considerations of efficiency and economy of administration are dispositive in this dispute.

■ The support of a motion to dismiss under § 305(a)(1) by a majority of creditors has been an important factor in the decision to dismiss by many courts dealing with involuntary bankruptcy cases. *See, e.g., M.*

*Egan Co.,* 24 B.R. at 191 (noting as a key factor in decision to dismiss that most creditors had supported dismissal and only 5% wanted the bankruptcy); *In re Rimpull Corp.,* 26 B.R. 267, 272 (Bankr.W.D.Mo. 1982) (noting fact that vast majority of creditors accepted and supported out of court arrangement and small minority wanted the bankruptcy were part important factors in "paradigm case" for dismissal); *Artists' Outlet,* 25 B.R. at 234 ("As it appears that a clear majority (in number) of creditors are satisfied with the out of court arrangement the court further sees no benefit if it were to retain jurisdiction."); *In re Bioline Laboratories, Inc.,* 9 B.R. 1013, 1019–23 (Bankr.E.D.N.Y.1981) (repeatedly noting that majority (60%) of creditors supported dismissal as a key factor in deciding to dismiss); *In re Luftek,* 6 B.R. 539, 548 (Bankr.E.D.N.Y.1980) (noting "acquiescence in alleged debtor's motion [to dismiss] by a substantial body of creditors holding a substantial part of its debt" as one of key factors in dismissing under § 305(a)(1)). The Court believes the weight of that factor is equally, if not more, applicable here in a voluntary case filed by a debtor with no real recognizable interest to preserve. In this case, there is only a creditors' interest, and the vast majority of those creditors have supported dismissal. The Court believes that authority indicates this is a very important factor in favor of dismissal.

■ Moreover, the evidence compels this Court to find that the interests of efficiency and economy of administration will be best served by the dismissal. Many courts have recognized economy and efficiency of administration as the paramount question under § 305(a)(1). As the Court stated in *Central Mort. & Trust:* "In evaluating the best interests of creditors and the debtor, efficiency and economy of administration are primary considerations." 50 B.R. at 1021 (quoting *In re Michael S. Starbuck,* 14 B.R. 134, 135 (Bankr.S.D.N.Y.1981)); *see also Artists' Outlet,* 25 B.R. at 233 ("The first consideration is economy and efficiency of administration.") (quoting *In Sun World Broadcasters, Inc.,* 5 B.R. 719, 721

(Bankr.M.D.Fla.1980)); *M. Egan Co.*, 24 B.R. at 191 ("courts have placed great emphasis ... on the economy of administration of a case, the need for additional administrative expenses, and duplication of effort.").

The Receiver has persuasively demonstrated that this Chapter 7 bankruptcy, with a court appointed Chapter 7 trustee, filed and venued in Cedar Rapids, at this time, would add unnecessary costs and duplication to efforts already under way. Dismissing the case would provide the Receiver with the opportunity to file the case in Des Moines as a Chapter 11 proceeding thereby allowing the Receiver to maintain control of Iowa Trust as the debtor-in-possession.

While the proposed Chapter 7 trustee offered to forgo any distribution fee on the $19.5 million the Receiver already had prepared for distribution, that will not offset the benefits of the Receiver's potential to act as the debtor-in-possession in a Chapter 11 case. As the Court has noted repeatedly, this is a factually exceptional case. The state of Iowa has committed the services of the Iowa Insurance Commissioner (the Receiver here), the services of staff attorneys from the Iowa Insurance Division, and the services of a variety of attorneys from the Iowa Attorney General's Office at no charge to the Iowa Trust. The evidence introduced by the Receiver indicates that those resources will continue to be available to the Iowa Trust if it is filed as a Chapter 11 case at a later date. The attorneys on the case are very familiar with the proceedings already underway to recover money for Iowa Trust, and would bring that expertise and the full resources of the Iowa Attorney General's Office to the case at little or no cost to the Iowa Trust. The case as a Chapter 7, with a Chapter 7 trustee cannot offer the same benefits.[1]

### Conclusion

Movants have met their burden of showing that this is an appropriate case for dismissal pursuant to 11 U.S.C. § 305.

### ORDER

IT IS THEREFORE ORDERED that pursuant to the order and judgment entered January 10, 1992, this case is dismissed.

DONE AND ORDERED.

---

**1.** The hostility toward the bankruptcy filing may also have been engendered by some unfortunate public comments by state officials involved in administering the Iowa Trust about the timing and cost of a bankruptcy distribution. The Court believes it would be remiss if it did not comment upon the fact that there appears to be some unwarranted personal hostility exhibited towards the Chapter 7 trustee (appointed by the U.S. Trustee) and his attorney. The Chapter 7 trustee has made clear that he is willing to cooperate in any manner necessary to achieve as rapid a distribution to the public entities as possible, and to do so without any cost to those parties.

The Chapter 7 trustee, Thomas McCuskey, has been a panel trustee in this district for many years. This Court is very confident that Mr. McCuskey was chosen by the U.S. Trustee as the trustee of this emotionally charged case because of his high degree of competence and integrity. The trustees in this district do not have the luxury of picking the cases that they wish to serve on, but rather are appointed by the U.S. Trustee's Office. Clearly, Mr. McCuskey did not choose to be put into the position in which he and his attorney found themselves. The undersigned is confident that if this case remained in a Chapter 7 proceeding in this district, Mr. McCuskey would have discharged his duties with his usual efficiency and competence.

Likewise, this Court has no reservation about the qualifications of Mr. McCuskey's attorney, Eric Lam. Mr. Lam is well known in Iowa as a very knowledgeable bankruptcy practitioner. The University of Iowa will soon be publishing a book he authored on bankruptcy procedure. Mr. Lam has written several articles on bankruptcy law and procedure and has authored one of the few published articles on municipal bankruptcies under Chapter 9. *See* Lam, *"Municipal Bankruptcy: The Problem with Chapter 9 Eligibility—A Proposal to Amend 11 U.S.C. § 109(C)(2)" 22 Ariz.St.L.J. 625 (1988).*

This Court wishes to make clear that the decision to dismiss this case pursuant to 11 U.S.C. § 305 should not be construed as any indication of the Court's lack of confidence in the ability of the trustee or his attorney to ably administer this case if it had remained in the bankruptcy proceeding.